UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>APPROXIMATELY $45,860 IN U.S. CURRENCY,<br><br>   Defendant. | Case No. 14-cv-03801-JCS<br><br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 16 |

## I. INTRODUCTION

This is an in rem action by the United States of America seeking forfeiture of $45,860 in United States currency (the "Currency") seized after the consensual search of an Express Mail package. The United States alleges that the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) due to its use in or derivation from transactions involving a controlled substance. Having complied with the notice requirements for a forfeiture action and received no claims to the Currency, the United States sought and received entry of default, and now moves for default judgment. The Court held a hearing on March 20, 2015. For the reasons stated below, the United States' Motion for Default Judgment is GRANTED.[1]

## II. BACKGROUND

### A. Factual Background

On March 18, 2014, postal inspectors at the United States Postal Service Oakland Processing and Distribution Center examined the exterior of an Express Mail package bearing the tracking number EM998577188US (the "Package"). Compl. (dkt. 1) ¶ 7.[2] The Package had been

---

[1] The United States has consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).
[2] The Court takes the factual allegations of the Complaint as true in the context of a motion for default judgment.

shipped overnight from North Carolina to Alameda, California. *Id.* ¶ 9.  Based on the Package's weight, labeling, method of shipping, origin, and destination, Postal Inspector Christopher McCollow became suspicious that the Package was related to illegal drug trafficking. *Id.*  A certified canine handler from the South San Francisco Police Department arrived with his dog Dugan. *Id.* ¶ 10.  Dugan, who is certified to detect the scent of controlled substances including marijuana, exhibited a change in behavior when exposed to the Package indicating that he had detected such a scent. *Id.*

The Package was addressed to Lorenzo Newell. *Id.* ¶ 11.  Postal inspectors determined that Newell did not live at the destination address. *Id.*  A person at that address informed postal inspectors that Newell was not present and she was not sure when he would return. *Id.*  Postal inspectors tried unsuccessfully to contact Newell by telephone. *Id.*

The return address on the Package included the name Cameren[3] Cook and the address 420 Mangum[4] Court, Fayetteville, North Carolina, as well as a telephone number. *Id.* ¶ 12 & Ex. A. Postal inspectors could not determine the current resident at that address, although a records search revealed a connection to someone named Adidas McNair. *Id.* ¶ 13.  Postal inspectors called Cook, who told them that the Package contained $46,000 in cash that he was sending to Newell, a friend, for delivery to a family member of Cook for safekeeping. *Id.* ¶ 14.  Cook consented to the postal inspectors opening the Package. *Id.*

The postal inspectors opened the Package and found tissue paper, Men's Wearhouse plastic bags, and Jockey-brand underwear boxes wrapped in duct tape. *Id.* ¶ 15 & Exs. B−D.  The boxes contained $45,860 in U.S. currency, including denominations ranging from five- to one hundred-dollar bills (the "Currency"). *Id.* ¶¶ 15, 17 & Exs. E−G.  The vast majority of the Currency consisted of twenty-dollar bills. *Id.* ¶ 17; *see id.* Ex. G.  The Complaint states that "[b]ased on his training and experience, Inspector McCollow is aware that narcotics traffickers

---

[3] Cook's first name is spelled in the Complaint as both "Cameren" and "Cameron." *See, e.g.*, Compl. ¶¶ 12, 19.  It appears to be spelled "Cameren" on the Package. *Id.* Ex. A.
[4] The Complaint states that the street was misspelled as "Magnum Court," and that the postal inspectors understood that to be a misspelling of "Mangum Court." Compl. ¶ 12.  A photograph of the Package attached to the Complaint, however, shows that the street of the return address was spelled "Mangum Ct.," not "Magnum." *Id.* Ex. A.

2

often use low denomination currency, primarily twenty dollar bills, to conduct their business." *Id.* ¶ 18.

A criminal history check revealed that, in 2011, Cook had been sentenced to three years in prison in Oklahoma for distribution of controlled substances and possession with intent to distribute. *Id.* ¶ 19. That conviction stemmed from a traffic stop for speeding, during which police found approximately four and a half pounds of marijuana in mailing envelopes in the trunk of a rental car that Cameron was driving. *Id.* ¶ 20. Cook's address at the time was listed as Richmond, California, and the rental car had California license plates. *Id.*

Postal inspectors telephoned Cook again after opening the Package. *Id.* ¶ 21. It is not clear from the Complaint whether that call occurred after the postal inspectors became aware of Cook's criminal history. *See id.* Cook claimed that the money was from a "cash business" selling music, and that he "sent the money to Lorenzo Newell for delivery to the family member because he thought previous money he sent to the family member had been stolen." *Id.* "Postal Inspector McCollow explained the forfeiture process to Cook and advised him that his money was being seized as part of the process." *Id.* ¶ 22. The Complaint states that the currency "was seized as proceeds of narcotic transactions or monies used in the furtherance of narcotic trafficking under 21 U.S.C. § 881(a)(6)." *Id.* ¶ 24.

The Complaint also recounts an incident that occurred some time after the postal inspectors opened the package:

> Four months later, on July 23, 2014, police pursued a car near a community outside of Fayetteville, North Carolina, after the car had caused a police car to run off the road. Once police caught up with the car, they encountered Cook. Police found a shrink-wrapped package containing three pounds of suspected marijuana, which Cook claimed. Police also found a Glock 27 semi-automatic handgun. Cook was arrested for both possession with intent to sell or deliver marijuana and with [sic] the possession of a firearm by a felon.

*Id.* ¶ 23.

A declaration submitted under seal includes additional evidence that Cook mailed the Currency as payment for a controlled substance. *See generally* Lowder Decl. (dkt. 21, under seal).

### B. Procedural History and Service

According to the Motion, the United States conducted an administrative forfeiture proceeding after seizing the Currency. Mot. (dkt. 16) at 3. The United States provided notice by publication, as well as direct notice to Cook, Newell, and McNair. *Id.* Only Cook filed a claim in that proceeding, on May 19, 2014. *Id.* Cook's administrative claim triggered the United States' obligation to pursue judicial forfeiture through the present action. *See id.* at 5; 18 U.S.C. § 983(a)(3)(A); 19 U.S.C. § 1608.

The United States filed its Complaint in this action on August 21, 2014, and filed a "Notice of Forfeiture Action" and a proposed warrant the same day. *See generally* Compl.; Notice (dkt. 3); Proposed Warrant (dkt. 4). The Clerk issued a warrant of arrest of property in rem on August 25, 2014. *See* Warrant (dkt. 6). The same day, the United States served the warrant, the Complaint, and other supporting documents on Cook's attorney pursuant to Supplemental Rule G(4)(b) of the Federal Rules of Civil Procedure. *See* 1st Certificate of Service (dkt. 7). On September 25, 2014, the United States filed proof of publication pursuant to Supplemental Rule G(4)(a), indicating that notice of the action had been available on the official forfeiture.gov website for thirty consecutive days, from August 26, 2014 through September 24, 2014. *See* Proof of Publication (dkt. 9). The United States also served Newell and McNair directly with the relevant documents on October 27, 2014. *See* 2d Certificate of Service (dkt. 11).

The period to file timely claims expired with no claim or response to the Complaint having been filed. *See* Request for Entry of Default (dkt. 14) at 3. Although Cook had filed a claim in the earlier administrative proceeding, his attorney notified the United States via email that he would not file a claim in this action. *Id.* The United States requested on December 4, 2014 that the Clerk enter default. *See generally id.* Default was entered on December 10, 2014, and the United States filed its present Motion on February 12, 2015. *See generally* Default (dkt. 15); Mot. No party has sought to vacate the entry of default, opposed the present Motion, or otherwise appeared in this action.

At the hearing on March 20, 2015, the Court noted that certain assertions in the United States' Motion were not supported by cognizable evidence or allegations. The United States has

4

since filed a declaration under seal addressing those matters. *See generally* Lowder Decl.

## III. ANALYSIS

### A. Preliminary Considerations

#### 1. Jurisdiction

When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has the affirmative duty to determine whether it has jurisdiction. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). The Court has jurisdiction over this action because it is brought by the United States and because it is an action for forfeiture under federal law. 28 U.S.C. §§ 1345, 1355(a). The Court has jurisdiction over the Currency because it was seized within this district. *See* Compl. ¶ 4.

#### 2. Adequacy of Service

Courts must determine the adequacy of service of process on a motion for default judgment. *Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008). This Court's Admiralty & Maritime Local Rules, which govern in rem actions, further provide that default—much less default judgment—cannot be entered unless notice has been provided as required by the Local Rules and the Federal Rules of Civil Procedure, and no timely and responsive pleading has been filed. *See* Admiralty L.R. 6-1, 6-2; *see also* Fed. R. Civ. P. Supp. G.

Here, the United States filed proof of publication indicating that it complied with the applicable rule for notice by publication, by posting notice on an official government website. *See* Proof of Publication; Fed. R. Civ. P. Supp. G(4)(a)(iv)(C). The United States also filed two Certificates of Service indicating that it complied with the rule for notice to known potential claimants, by sending direct notice to Cook's attorney, Newell, and McNair. *See* 1st Certificate of Service; 2d Certificate of Service; Fed. R. Civ. P. Supp. G(4)(b). The Court is therefore satisfied that the United States met the requirements for notice and service in this in rem action.

### B. Legal Standard for Entry of Default Judgment

After default has been entered against a party, a district court may grant an application for default judgment in its discretion. *See* Fed. R. Civ. P. 55(b)(2). If the court is satisfied that

jurisdiction is proper and that service of process upon the defendant was adequate, it then considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986). In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true. *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

### C. The United States Is Entitled to Default Judgment

The Court first addresses "the merits of [the United States'] substantive claim" and "the sufficiency of the Complaint," *Eitel*, 782 F.2d at 1471, two factors that tend to coalesce where, as here, the moving party relies primarily on its Complaint to demonstrate merit, and no response has been filed by an opposing party. The United States brings this action pursuant to 21 U.S.C. § 881(a)(6), which provides in relevant part that "moneys . . . furnished or intended to be furnished by any person in [unlawful] exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of [the federal drug enforcement laws]" are subject to forfeiture. *See* Compl. ¶ 26. "In a suit or action brought under any civil forfeiture statute . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1); *see also id.* § 983(i) (defining the term "civil forfeiture statute"). The Court must therefore consider whether, taking the factual allegations of the Complaint as true, the United States has a meritorious claim that the Currency is subject to forfeiture due to its relationship to a transaction concerning a controlled substance.

The Court finds that these factors favor granting default judgment. The Complaint alleges that Cook—the person who initially claimed ownership of the Currency—had a history of interstate trafficking of relatively large quantities of marijuana, and was found again with a

relatively large quantity of marijuana several months after postal inspectors discovered the Currency. Compl. ¶¶ 14, 19−20, 23. Cook mailed the Currency to an address that was not the intended recipient's primary residence, and apparently listed an address that was not his own as the return address. *Id.* ¶¶ 11−13. His stated reasons for sending the Currency were implausible and somewhat contradictory—his first explanation suggested that he was sending it to a family member for safekeeping, but he later told postal inspectors that he was sending it "because he thought previous money he sent to the family member had been stolen." *See id.* ¶¶ 14, 21. Further, a police dog trained to detect controlled substances indicated that he detected such a scent from the Package, and the Currency consisted of a large amount of cash in a denomination favored by narcotics traffickers. Compl. ¶¶ 10,18; *see also United States v. Approximately $17,872 in U.S. Currency*, No. C 08-03346 WHA, 2009 WL 2990496, at *3 (N.D. Cal. Sept. 11, 2009) ("Facts that have contributed to findings of probable cause have included: recovery of large amounts of currency not bound by standard bank currency straps, possession of a large amount of currency, and small denominations of bills." (citations omitted)).

Taken together, these facts lead to the conclusion that the Currency was furnished in exchange for a controlled substance, that it consisted of proceeds traceable to such an exchange, or both. *See* 21 U.S.C. § 881(a)(6). The allegations of the Complaint are therefore sufficient to state a claim for forfeiture, and—taken as true for the purpose of this Motion, *see TeleVideo Systems*, 826 F.2d at 917−18—indicate that the United States' claim has merit. The sealed declaration submitted after the March 20, 2015 hearing includes additional support for the merits of the United States' claim that the Currency was furnished in exchange for a controlled substance. *See generally* Lowder Decl.[5] Accordingly, the second and third *Eitel* factors support granting the United States' Motion.

The remaining *Eitel* factors also generally weigh in favor of entering default judgment, particularly in light of the fact that the only person who filed an administrative claim for the Currency has apparently made a considered decision, with advice of counsel, not to pursue a claim

---

[5] "[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish . . . that the property is subject to forfeiture . . . ." 18 U.S.C. § 983(c)(2).

in this action. *See* Mot. at 5. With respect to the first factor, the United States will be prejudiced if money that is properly forfeitable is left in legal limbo indefinitely. As for the fourth, the sum of money at stake is not insubstantial, but not so large as to warrant denying default judgment. The fifth factors supports default judgment because there is no likelihood of any dispute of material fact where the only likely claimant has decided not to appear. There is also no indication of excusable neglect where that potential claimant's attorney received direct notice of the action and informed the United States that his client would not file a claim. Finally, although the general policy favoring decisions on the merits will always weigh against default judgment to some extent, "[w]here, as here, [any potential claimants] fail to respond to a Complaint, a decision on the merits is impractical, if not impossible." *See Penpower Tech. Ltd. v. S.P.C. Tech.*, 627 F. Supp. 2d 1083, 1093 (N.D. Cal. 2008). Accordingly, the Court GRANTS the United States' Motion for Default Judgment.

## IV.   CONCLUSION

For the reasons stated above, the United States' Motion for Default Judgment is GRANTED. The defendant currency shall be and hereby is condemned and forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6), and all right, title, and interest in the defendant currency is vested in the United States. The Clerk is instructed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**

Dated: March 24, 2015

JOSEPH C. SPERO
Chief Magistrate Judge